841 F.2d 886
 1988-1 Trade Cases 67,911
 David A. BOONE; Stephen P. Fox, Individually and as General
Partners of DSC-3 Group, a California Limited Partnership
and as General Partners of Market/Post, Ltd., a California
Limited Partnership; Dave Goglio; Donald Goglio,
individually and as General Partners of Three G's, a
California Limited Partnership, Plaintiffs-Appellants,
v.
REDEVELOPMENT AGENCY OF the CITY OF SAN JOSE, a Public Body
Corporate and Politic of the State of California; City of
San Jose, a Municipal Corporation and Subdivision of the
State of California; the Koll Company, a California
corporation, Defendants-Appellees.
 No. 87-15046.
 United States Court of Appeals,
Ninth Circuit.
 Submitted Jan. 4, 1988.
Decided March 1, 1988.
 
 Herbert F. Kaiser, San Francisco, Cal., for plaintiffs-appellants.
 Michael N. Khourie and James G. Gilliland, Jr., Khourie & Crew, P.C., San Francisco, Cal., for defendants-appellees San Jose.
 David T. Alexander, Jackson, Tufts, Cole & Black, San Jose, Cal., for defendant-appellee Koll.
 Appeal from the United States District Court for the Northern District of California.
 Before WALLACE and POOLE,* Circuit Judges, and KELLEHER,** District Judge.
 WALLACE, Circuit Judge:
 
 
 1
 Boone and others (developers) appeal from an order dismissing their antitrust and civil rights action against the Redevelopment Agency of the City of San Jose (agency), the City of San Jose, and the Koll Company (Koll). We have jurisdiction pursuant to 28 U.S.C. Sec. 1291, and we affirm.
 
 
 2
 * This case involves a decision by the agency and the City Council of San Jose (council) not to construct a multi-story parking garage at a certain location in downtown San Jose. The agency is a municipal corporation created under California's Community Redevelopment Law, Cal.Health & Safety Code Secs. 33000-33738 (redevelopment act), for the purpose of facilitating urban renewal in the downtown San Jose area. On November 17, 1978, the council, on recommendation of the agency, enacted a comprehensive plan for combatting urban blight in the city's downtown area. Under the plan, the city was to finance construction of a multi-story parking garage.
 
 
 3
 The developers are in the real estate business and, pursuant to the city's redevelopment plan, began construction of an office building in downtown San Jose in mid-1983. They allege that they began construction of this building with the understanding that the city would provide them with adequate parking in the proposed downtown parking building. Because of this understanding, the developers did not construct adequate on-site parking.
 
 
 4
 Koll is also a real estate developer. On March 29, 1984, the council approved an amendment to the redevelopment plan, which allowed Koll to build an office building in downtown San Jose. This amendment required the relocation of the proposed municipal parking garage to the periphery of the redevelopment area. The developers allege that in return for not protesting the amendment, unnamed city officials promised to reserve a section of the relocated municipal parking structure for the developers' exclusive use. Unlike the developers, Koll planned and constructed adequate on-site parking for its building.
 
 
 5
 The developers allege that after they finished construction of their building, the city reneged on its promise to provide them with parking in the proposed municipal garage. The developers subsequently brought suit against Koll, the agency, and the city which included claims under the Sherman and Clayton Antitrust Acts, 15 U.S.C. Secs. 1, 2, 16, and the equal protection and due process clauses of the fourteenth amendment, alleging that Koll had conspired with members of the agency and the council to relocate the proposed parking structure and not to give the developers exclusive parking in that structure, in order to force the developers to sell their building to Koll at a bargain price. This "forced sale," in turn, would allegedly have given Koll a monopoly on office space in the downtown San Jose area.
 
 
 6
 The district court dismissed the developers' initial and first amended complaints with leave to amend. The first two claims for antitrust and civil rights violations in their second amended complaint were dismissed with prejudice for failure to state a claim upon which relief could be granted. Fed.R.Civ.P. 12(b)(6). The pendent claims for promissory reliance and inverse condemnation were dismissed without prejudice so that they could be pursued in state court. The developers then timely filed this appeal from dismissal of the first two claims.
 
 II
 
 7
 We review the dismissal of an action for failure to state a claim de novo. Fort Vancouver Plywood Co. v. United States, 747 F.2d 547, 552 (9th Cir.1984). Reading the allegations in the complaint in a light most favorable to the nonmovant, and taking all of the allegations in the complaint as being true, see Western Reserve Oil & Gas Co. v. New, 765 F.2d 1428, 1430 (9th Cir.1985) (Western Reserve ), cert. denied, 474 U.S. 1056, 106 S.Ct. 795, 88 L.Ed.2d 773 (1986), we will affirm only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).
 
 
 8
 We discuss first the claims against the city and agency and then the claim against Koll.A.
 
 
 9
 The city and agency argue that they are immunized from liability by the state action exception from the antitrust laws created in Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) (Parker ). The basis of the state action exception is that the free market principles embodied by the Sherman Antitrust Act must give way to the countervailing principles rooted in federalism and state sovereignty that states must be free to act upon local concerns, even if these actions have anticompetitive results. See id. at 350-51, 63 S.Ct. at 313. This exception was later expanded to protect municipalities in Community Communications Co. v. City of Boulder, 455 U.S. 40, 51-52, 102 S.Ct. 835, 840-41, 70 L.Ed.2d 810 (1982) (Boulder ). The Court ruled in Boulder that anticompetitive acts of a municipality that would normally give rise to liability under the Sherman Act are shielded if the municipality acted pursuant to a "clearly articulated and affirmatively expressed" state policy to displace competition with regulation. Id.; see also Hallie v. City of Eau Claire, 471 U.S. 34, 39, 105 S.Ct. 1713, 1716, 85 L.Ed.2d 24 (1985) (Hallie ). Pursuant to this test, we must undertake a two-part inquiry to determine whether state action immunity applies. We must first determine whether the California legislature authorized the challenged actions of the city and the agency. Then we must determine whether the legislature intended to displace competition with regulation. Both elements are prerequisites to proper application of the state action exception to municipal action.
 
 
 10
 A state policy is considered clearly articulated and affirmatively expressed if the statutory provision empowering the municipality's action plainly shows that "the legislature contemplated the kind of action complained of." Hallie, 471 U.S. at 44, 105 S.Ct. at 1719, quoting City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 415, 98 S.Ct. 1123, 1138, 55 L.Ed.2d 364 (1978).
 
 
 11
 Applying these principles to the instant case, the city and agency argue that they are immunized because all of their actions were carried out under the state authority of the redevelopment act. The purpose of the redevelopment act was to combat what the state legislature perceived to be a "serious and growing menace" created by blighted areas. Redevelopment Act Sec. 33035(a). Redevelopment agencies, such as San Jose's, were authorized by the redevelopment act to facilitate urban redevelopment. The agencies and the municipalities were granted powers by the redevelopment act as broad as the problem they faced. The redevelopment act declares that it is the policy of the state to eliminate blight "through the employment of all appropriate means," id. Sec. 33037(a). To this end, the redevelopment act authorizes municipalities to enact rehabilitation plans, id. Sec. 33131(a), zone and rezone and grant exceptions from building regulations and ordinances, id. Sec. 33220(d), issue bonds, id. Sec. 33341, and condemn property, id. Sec. 33342. In addition, the redevelopment act specifically authorizes the redevelopment agency, with city council approval, to "amend or modify" redevelopment plans as necessary to carry out urban renewal, see Redevelopment Act Sec. 33450, as was done here. These acts, which are clearly and affirmatively authorized by the California legislature, are precisely the types of activity that the developers challenge. Hence, the activities of the city and agency satisfy the first part of our two-prong test.
 
 
 12
 Moreover, the nature of activities enumerated in these provisions expresses an intent by the legislature to authorize the city to do a number of things that are clearly anticompetitive. The power to zone and rezone, for example, by its very nature encompasses the power to exclude competition. These "state statutes need not require anti-competitive conduct for the exemption to apply when it is apparent that anticompetitive effects would result from a broad authority to regulate." Mercy-Peninsula Ambulance, Inc. v. County of San Mateo, 791 F.2d 755, 757 (9th Cir.1986). We have ruled that similar broad grants of authority alone are sufficient to immunize "[v]irtually any anti-competitive effect," id. at 758, which "logically would result from [such] broad authority to regulate." Id., quoting Grason Electric Co. v. Sacramento Municipal Utility District, 770 F.2d 833, 838 (9th Cir.1985), cert. denied, 474 U.S. 1103, 106 S.Ct. 886, 88 L.Ed.2d 921 (1986). Accordingly, we conclude that the second part of our test, which requires that we find a legislative intent to displace the free market with state regulation, has been satisfied.
 
 
 13
 This specific grant of authority, coupled with the broad power to remedy blight discussed above, convinces us that the state legislature "clearly articulated and affirmatively expressed" a policy to permit anti-competitive acts, and that the state legislature contemplated the kind of municipal action about which the developers complain. See Hallie, 471 U.S. at 39, 44, 105 S.Ct. at 1716, 1719. Our conclusion is in accord with that of other courts that have considered the state action immunity exception in light of redevelopment statutes similar to California's, which authorize instrumentalities of the state to engage in activities that could have anticompetitive consequences. See, e.g., Cine 42nd Street Theatre Corp. v. Nederlander Organization, Inc., 790 F.2d 1032, 1048 (2d Cir.1986); Scott v. City of Sioux City, 736 F.2d 1207 (8th Cir.1984), cert. denied, 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985); Reasor v. City of Norfolk, 606 F.Supp. 788 (E.D.Va.1984).
 
 
 14
 Nevertheless, the developers argue that the redevelopment act does not apply because downtown San Jose was not a "blighted area" at the time the city acted. By its own terms, the redevelopment act was intended to promote redevelopment of "blighted areas." Redevelopment Act Sec. 33037(a). These areas are defined as those that constitute such a "serious physical, social, or economic burden on the community" that they "cannot reasonably be expected to be reversed or alleviated by private enterprise acting alone." Redevelopment Act Secs. 33030, 33032. According to the developers, the necessary prerequisites to finding blight were absent at the time the city used the redevelopment act to amend the plan. From this, they conclude that the city and agency cannot rely on the statute to immunize their actions.
 
 
 15
 Because this is an appeal from a dismissal for failure to state a claim, we must assume as true all factual allegations of material fact in the developers' complaint. See Western Reserve, 765 F.2d at 1430. Thus, we must assume, as the developers allege, that the council erroneously determined that, at the time of the amendment, its downtown area was eligible for action under the redevelopment act. Nevertheless, it does not follow that the city and agency would be stripped of antitrust immunity merely because they imperfectly exercise their power under state law. A similar claim was made in Llewellyn v. Crothers, 765 F.2d 769, 774 (9th Cir.1985) (Llewellyn ), where we ruled that Oregon's Worker's Compensation Department was immune from antitrust liability, despite allegations made by a group of chiropractors that the Board had erroneously set reimbursement rates for chiropractic services artificially low. Although Llewellyn involved the action of a state agency, and not a municipality, the same concerns that were raised in Llewellyn about the role of this court in reviewing decisions by state actors apply to this case:
 
 
 16
 " 'Ordinary' errors or abuses in the administration of powers conferred by the state should be left for state tribunals to control." ... A contrary rule would tempt aggrieved parties to forego available state corrective processes in hopes of obtaining the treble damages remedy conferred by the Sherman Act. Here state corrective processes were available, and the aggrieved parties could resort to them.
 
 
 17
 Id. at 774 (citations omitted).
 
 
 18
 Decisions made by municipalities acting under the redevelopment act are reviewable in state courts. See, e.g., Berggren v. Moore, 61 Cal.2d 347, 38 Cal.Rptr. 722, 392 P.2d 522 (1964); Kehoe v. City of Berkeley, 67 Cal.App.3d 666, 135 Cal.Rptr. 700 (1977); Babcock v. Community Redevelopment Agency of the City of Los Angeles, 148 Cal.App.2d 38, 306 P.2d 513 (1957). The developers have filed suit in state court, seeking review of the city's and agency's action. In this situation, the concerns over federalism and state sovereignty raised in Hallie and Llewellyn dictate that the developers not be allowed to use federal antitrust law to remedy their claim that the city and the agency exceeded their authority under state law. They do not forfeit their immunity merely because their execution of the powers granted to them under the redevelopment act may have been imperfect in operation. See Llewellyn, 765 F.2d at 774.
 
 
 19
 The developers next argue that their allegations that city officials acted in bad faith and as participants in a larger conspiracy, if proven, would strip the city of its antitrust immunity. This claim is also controlled by Llewellyn. There, we affirmed a summary judgment against the plaintiffs on their antitrust claims, "despite the possibility of improper motivation on the part of [agency officials]," on the grounds that:
 
 
 20
 The availability of Parker immunity ... does not depend on the subjective motivations of the individual actors, but rather on the satisfaction of the objective standards set forth in Parker and authorities which interpret it. This must be so if the state action exemption is to remain faithful to its foundations in federalism and state sovereignty. A contrary conclusion would compel the federal courts to intrude upon internal state affairs whenever a plaintiff could present colorable allegations of bad faith on the part of defendants.
 
 
 21
 765 F.2d at 774.
 
 
 22
 For the reasons discussed previously, the city and agency were acting pursuant to a clearly articulated and affirmatively expressed state policy to replace competition, and therefore the objective standards set forth in Parker and Llewellyn are met. The district court properly dismissed the developers' antitrust claims against the city and agency.
 
 B.
 
 23
 The developers' next claim, brought pursuant to 42 U.S.C. Sec. 1983, alleges that the city and agency denied them their fourteenth amendment equal protection, substantive due process, and procedural due process rights. We first discuss their equal protection and substantive due process claims.
 
 
 24
 The developers base their equal protection and substantive due process challenge on the claim that the city and agency induced them into constructing an office building through promises of providing adequate parking facilities, and then denied them access to such facilities, which were financed in part through tax assessments on the developers' property. Such actions by the city and agency are alleged to have discriminatorily deprived them of economically viable use of their investment and to have unlawfully diverted funds from property tax assessments to Koll's exclusive use.
 
 
 25
 The standard governing attacks on economic regulations brought under the equal protection clause is well established. "Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions ... our decisions presume the constitutionality of the [ordinances] ... and require only that the [ordinance] challenged be rationally related to a legitimate state interest." City of New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516-17, 49 L.Ed.2d 511 (1976). Similarly, "ordinances survive a substantive due process challenge if they were designed to accomplish an objective within the government's police power, and if a rational relationship existed between the provisions and purpose of the ordinances." Scott v. City of Sioux City, 736 F.2d 1207, 1216 (8th Cir.1984), cert. denied, 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985); see Construction Industry Association of Sonoma County v. City of Petaluma, 522 F.2d 897, 906 & n. 11 (9th Cir.1975), cert. denied, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 342 (1976).
 
 
 26
 Here, the developers have not alleged that the interest of the city and agency in urban redevelopment is illegitimate. Such a claim would be patently frivolous. Moreover, the municipality's regulation of parking is facially "rationally related" to the ends of urban renewal. Thus, we find no violation of the developers' equal protection or substantive due process rights.
 
 
 27
 Nor have the developers stated a claim under the procedural due process clause. To do so, the developers must allege facts from which we can conclude that they had a vested property right to parking in the proposed garage. Whether a property right exists is determined by state law. The developers allege that they acquired a property right in the original parking structure, either by the city and agency issuing a building permit, or by common-law estoppel. Under state law, however, we find no basis for such a claim of entitlement under either theory.
 
 
 28
 The developers' reliance on the building permit issued to them by the city is misplaced. In their complaint, they did not allege that the city promised to provide parking in the building permit itself. The complaint states only that the permit was issued after discussions with the city and agency officials concerning the proposed garage. Absent allegations of a specific provision in the building permit requiring the city to provide parking, the permit alone is insufficient to create a cognizable property interest.
 
 
 29
 The claim that a property interest in the proposed parking facility was created by estoppel is similarly deficient. The developers have cited no case, nor have we found one, to support their claim that a property interest can be created by estoppel under the facts of this case.
 
 
 30
 We need not reach that issue, however, because even if estoppel could create a property interest under California law, their pleading is insufficient to state a claim for estoppel. The alleged promises on which the developers argue they relied are pleaded in an entirely conclusory fashion. Moreover, the complaint fails to disclose facts which establish that these promises were made by persons with authority, or apparent authority, so that the developers, as experienced businessmen, would be justified in relying on them. Nowhere in any of their three complaints do they identify who made the promises, or what the person's legal authority, if any, was to make them. Nowhere in their complaint is there an allegation that the council promised them parking. Under the redevelopment act, it appears that such authority is granted only to the council. See, e.g., Redevelopment Act Sec. 33366-67 (city council approval required for redevelopment plan); id. Sec. 33368 (decision of city council will be final); id. Sec. 33450 (redevelopment plan can be amended only by city council, subject to referendum). In short, the developers plead no facts from which we can infer that their reliance on the alleged promises was in any way justifiable. Absent such allegations, the developers cannot properly assert a claim of estoppel.
 
 III
 
 31
 The developers also brought antitrust claims against Koll, alleging that it conspired with city officials to amend the redevelopment plan, thereby limiting the amount of parking available to the developers, in order to drive down the value of their building. Koll argues, and the district court ruled, however, that Koll's involvement in the alleged conspiracy consisted of legitimate lobbying activities that are immunized from liability by the Noerr-Pennington exception to the Sherman Act. In United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) (Pennington ), the Supreme Court ruled that
 
 
 32
 [E]fforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as a part of a broader scheme itself violative of the Sherman Act.
 
 
 33
 Id. at 670, 85 S.Ct. at 1593; see also Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 136, 81 S.Ct. 523, 529, 5 L.Ed.2d 464 (1961) (Noerr ). A contrary rule, according to the Court, could impede first amendment rights to petition the government. See 365 U.S. at 137-38, 81 S.Ct. at 529-30.
 
 
 34
 In our analysis of this issue, we will first determine whether the activities of Koll are of the type that the Noerr-Pennington doctrine seeks to protect and then discuss whether any exceptions to the Noerr-Pennington protections apply. Our review of the developers' arguments, however, is guided in part by the fundamental first amendment values that the Noerr-Pennington doctrine is designed to protect. In order not to chill legitimate lobbying activities, it is important that a plaintiff's complaint contain specific allegations demonstrating that the Noerr-Pennington protections do not apply. See Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers, 542 F.2d 1076, 1080-81 (9th Cir.1976) (Franchise Realty ), cert. denied, 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977). Conclusory allegations are insufficient to strip them of their Noerr-Pennington protection. Id. at 1081. Although we may be more generous in reviewing complaints in other contexts, our responsibilities under the first amendment in a case like this one require us to demand that a plaintiff's allegations be made with specificity. Id. at 1082.
 
 A.
 
 35
 The developers' complaint contains four basic allegations against Koll: (1) that Koll "developed close relationships" with city officials; (2) that Koll made "false reports and misrepresentations" to the council concerning the availability of parking downtown; (3) that Koll had "ex parte secret contact[s]" with city officials that culminated in "secret ... agreements" to amend the redevelopment plan; and (4) that Koll "hired key city officials" and "made direct payments" to city and agency officials.
 
 
 36
 The first allegation goes to the very heart of the Noerr-Pennington doctrine. Successful petitioning of government often depends on the development of close relations between government officials and those who seek government benefits. Indeed, cultivating close ties with government officials is the essence of lobbying. Such conduct certainly falls within the ambit of the Noerr-Pennington doctrine.
 
 
 37
 The same is true of the developers' allegation that Koll misrepresented facts concerning the availability of parking in the redevelopment district. As pointed out by the Court in Noerr, attempts to influence public officials may occasionally result in "deception of the public, manufacture of bogus sources of reference, [and] distortion of public sources of information." 365 U.S. at 140, 81 S.Ct. at 531. Such deception, as "reprehensible as it is, can be of no consequence so far as the Sherman Act is concerned." Id. at 145, 81 S.Ct. at 533. While we do not condone misrepresentations, we trust that the council and agency, acting in the political sphere, can "accommodate false statements and reveal their falsity." Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc., 690 F.2d 1240, 1261 (9th Cir.1982) (Clipper Exxpress ), cert. denied, 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983).
 
 
 38
 The developers' allegations of shadowy secret meetings and covert agreements do not take their claim outside of Noerr-Pennington. They have not alleged the nature of these secret agreements and secret meetings, nor have they identified the "key city officials" allegedly involved. Moreover, they have not alleged that these activities were either illegal or outside the "traditional protection[s] afforded this activity by the First Amendment." Franchise Realty, 542 F.2d at 1085. Most notably, the developers did not allege that these activities were perpetrated for reasons other than legitimate petitioning of government.
 
 
 39
 Even if they had made such specific allegations, the behavior they ostensibly describe falls squarely within the Noerr-Pennington doctrine. In In re Airport Car Rental Antitrust Litigation, 766 F.2d 1292, 1295 (9th Cir.1985), cert. denied, 476 U.S. 1141, 106 S.Ct. 2248, 90 L.Ed.2d 694 (1986), we ruled that private meetings between government officials and individuals seeking to monopolize the airport car rental market was a form of advocacy protected by the Noerr-Pennington rule. The redevelopment process, by its very nature, allows for ex parte deliberations between decision makers and advocates of a particular view. See In re Airport Car Rental Antitrust Litigation, 521 F.Supp. 568, 588 (N.D.Cal.1981) (evidence of a series of ex parte meetings between defendants and public officials resulting in a contract to exclude competitors "prove[s] nothing other than a classic case for application of the Noerr-Pennington doctrine"), aff'd, 693 F.2d 84 (9th Cir.1982), cert. denied, 462 U.S. 1133, 103 S.Ct. 3114, 77 L.Ed.2d 1368 (1983).
 
 
 40
 The developers' allegations of "payments to" and the "hiring of" key city officials suffer a similar fate. Again, they make these allegations in the most conclusory of fashions. We are not told who, when, how much, or for what purpose. More important, even if these allegations had been made with the requisite specificity, the alleged activities are facially valid. Former government officials are often times hired by organizations seeking to petition government. Their expertise makes them particularly well suited for such a role. Payments to public officials, in the form of honoraria or campaign contributions, is a legal and well-accepted part of our political process. As stated by the Seventh Circuit:
 
 
 41
 Clearly, allegations concerning campaign contributions do not convert into a Sherman Act violation conduct which Noerr held was not covered by the Act. We do not condone the giving or acceptance of campaign contributions as inducements to support the donor's interests in the legislative process. We merely hold that this conduct was not intended to be covered by the Sherman Act.
 
 
 42
 Metro Cable Co. v. CATV of Rockford, Inc., 516 F.2d 220, 231 (7th Cir.1975) (Metro Cable ); see also Noerr Motor Freight, Inc. v. Eastern Railroad Presidents Conference, 155 F.Supp. 768, 803-04 (E.D.Pa.1957), aff'd, 273 F.2d 218 (3d Cir.1959), rev'd, Noerr, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 864 (1961) (allegations that competitors made campaign contributions and worked in close liaison with public officials are insufficient to state an antitrust claim).
 
 
 43
 The developers did not allege that the hiring of, or payments to, the public officials was otherwise illegal. Thus, even if these alleged activities were carried out solely to influence the agency and the council, they fall within the Noerr-Pennington doctrine.
 
 B.
 
 44
 That the complained about conduct is the type protected by the Noerr-Pennington rule does not end the dispute. Such conduct may be excepted from the protection in certain circumstances. The developers' argument that such exceptions apply will now be considered.
 
 
 45
 While the developers' brief is far from clear, they appear to contend that we should apply any one of three possible exceptions to the Noerr-Pennington doctrine. The first exception that they argue is known as the "sham exception," and is based on a suggestion made by the Court in Noerr that when "a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor ... [then] application of the Sherman Act would be justified." 365 U.S. at 144, 81 S.Ct. at 533. The developers have neither alleged the existence of a publicity campaign nor that Koll was not genuinely seeking official action from the city and agency. Such allegations are necessary to state a claim under this exception. See Franchise Realty, 542 F.2d at 1080-81.
 
 
 46
 The developers next contend that their allegations of misrepresentations, payments to public officials, and "secret backroom dealings" on the part of Koll fall within a second exception to Noerr created in California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (Trucking Unlimited ). In Trucking Unlimited, the Court ruled that illegal or fraudulent lobbying activities that would normally be immunized by Noerr-Pennington lose their protection if they occur in a judicial or quasi-judicial setting:
 
 
 47
 There are many other forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations. Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process.
 
 
 48
 Id. at 513, 92 S.Ct. at 613; see also Clipper Exxpress, 674 F.2d at 1271. Our analysis of the developers' claim, therefore, is guided in part by the role played by the agency and the council when the plan was amended and the developers' parking was limited. If the agency and the council were acting as adjudicative bodies, the range of lobbying activities immunized by Noerr-Pennington would be much narrower.
 
 
 49
 We faced a similar situation in Franchise Realty. In that case, the plaintiff sued two associations of restaurant and hotel employers which had allegedly conspired to oppose the plaintiff's efforts to secure building permits from the San Francisco Board of Permit Appeals. 542 F.2d at 1078. We ruled that the Board of Permit Appeals was "as much a political as an adjudicatory body." Id. at 1079. Like the Board of Permit Appeals in Franchise Realty, the agency and the council have broad discretion to amend the plan, and approve or disapprove of new projects, whenever they deem it is "necessary or desirable" to carry out the ends of redevelopment. Redevelopment Act Sec. 33450. Determination of what is "necessary or desirable" is vested exclusively with the agency and the council. As in Franchise Realty, "[t]he absence of more definite standards suggests that the [agency] is as much a political as an adjudicatory body." 542 F.2d at 1079. Indeed, nowhere in their complaint do the developers specifically allege that the agency and the council were acting as adjudicatory bodies when they carried out the complained of activities. Rather, they alleged that they were barred access to the city's administrative and "legislative" processes.
 
 
 50
 The developers now specifically contend that the agency and council's decision was adjudicatory. Their reliance on Horn v. County of Ventura, 24 Cal.3d 605, 156 Cal.Rptr. 718, 596 P.2d 1134 (1979), for this proposition is misplaced. In Horn, the court ruled that the approval of a subdivision redevelopment by a planning department that would result in a "substantial" deprivation in the value of adjoining property was an adjudicatory act to which procedural due process protections attached. Id. at 612, 156 Cal.Rptr. 718, 596 P.2d 1134. The court based its holding primarily on the fact that "[s]ubdivision approvals, like variances and conditional use permits, involve the application of general standards to specific parcels of real property. Such governmental conduct, affecting the relatively few, is 'determined by facts peculiar to the individual case' and is 'adjudicatory' in nature." Id. at 614, 156 Cal.Rptr. 718, 596 P.2d 1134. The court distinguished this situation from one involving "general rezoning" of a large area, which is more akin to a legislative process. Id. at 613, 156 Cal.Rptr. 718, 596 P.2d 1134; see also San Diego Building Contractors Association v. City Council, 13 Cal.3d 205, 208, 118 Cal.Rptr. 146, 529 P.2d 570 (1974), appeal dismissed, 427 U.S. 901, 96 S.Ct. 3184, 49 L.Ed.2d 1195 (1976). A redevelopment plan and its amendments obviously involve a large area and affects virtually every member of the community. In addition, all amendments to the redevelopment plan must be approved by the city council, which is defined by the redevelopment act as a "legislative body." Redevelopment Act Sec. 33007. Thus, even though proceedings before the agency have some of the trappings normally associated with adjudicatory procedures, all final decisions are made by the council, a distinctly legislative body. Although this case does not require us to draw a bright line between adjudicative and legislative processes, these considerations convince us that, like the Board of Permit Appeals involved in Franchise Realty, the agency and council were carrying out essentially legislative tasks in amending the plan.
 
 
 51
 The legislative nature of the city's decision distinguishes this case from Ernest W. Hahn, Inc. v. Codding, 615 F.2d 830 (9th Cir.1980) (Hahn ). There, the plaintiff (Hahn) alleged that the defendant (Codding) had filed a series of frivolous lawsuits solely to interfere with Hahn's attempt to build a shopping center. Id. at 836. We applied the Trucking Unlimited exception on the grounds that "Codding has invoked the judicial process not once, but thirteen times, in what the Hahn complaint describes as a thus far successful effort to prevent a competitor from entering the marketplace." Hahn, 615 F.2d at 842. Hahn clearly involves the misuse of judicial and not legislative processes. We conclude that the Trucking Unlimited exception to the Noerr protection does not apply to the actions of the city and the agency.
 
 
 52
 The developers' final argument is that because they have alleged that city officials were active participants in the alleged conspiracy, we should apply the so-called "co-conspirator" exception to Noerr-Pennington. In Harman v. Valley National Bank of Arizona, 339 F.2d 564, 566 (9th Cir.1964), a case decided before Pennington, we suggested in dicta that Noerr might not apply if a public official were a participating conspirator in the alleged agreement to restrain trade. See id. This view, however, was repudiated by Pennington. As we stated in Sun Valley Disposal Co. v. Silver State Disposal Co., 420 F.2d 341, 342-43 (9th Cir.1969):
 
 
 53
 The Supreme Court decisions have eroded the authority of ... Harman ...
 
 
 54
 ....
 
 
 55
 Pennington held that efforts to influence public officials are not illegal even if part of a broader anticompetitive scheme. Harman was based on this view that an attempt to influence an official when part of a larger scheme is subject to the federal antitrust laws.
 
 
 56
 Thus, Noerr-Pennington cannot be circumvented by merely alleging that a government official was involved in the alleged conspiracy. See also Metro Cable, 516 F.2d at 230 (rejecting co-conspirator exception because it would "abrogate" the Noerr doctrine).
 
 IV
 
 57
 The developers have been given two opportunities to amend their complaint to state a cause of action against the city and Koll. The allegations made against the city in their second amended complaint fall squarely within the Parker state action antitrust exception. Their allegations against Koll consist of activities clearly protected by the Noerr-Pennington doctrine. Their civil rights claims are facially deficient. Therefore, the district court's dismissal of the developers' action is affirmed.
 
 
 58
 AFFIRMED.
 
 
 
 *
 Judge Poole was drawn to replace Judge Kennedy. He has read the briefs, reviewed the record, and listened to the tape of oral argument held on 5/13/87, in case No. 86-2506
 
 
 **
 Honorable Robert J. Kelleher, United States District Judge, Central District of California, sitting by designation