Donald **OBERNDORF; Leo Stern; Harry Paul Wertheimer; Carol Brodie, Trust Administrator for Edith O. Wertheimer Trust; Dottie Hammel; and Block 173 Associates, a Colorado General Partnership, Plaintiffs–Appellants,**

v.

The **CITY AND COUNTY OF DENVER: The City Council of the City & County of Denver, by its council members of the City Council (not as individuals but as members of the City Council), T.J. Hackworth, J.L. Sandos, Stephanie A. Foote, Paul L. Swalm, John J. Silchia, Nieves Peres McIntire, Hiawatha Davis, Jr., Salvadore Carpio, Cathy Donohue, William R. Roberts, Robert L. Crider, Cathy Reynolds, William A. Scheitler: The Denver Urban Renewal Authority; Federico Pena, as Mayor of the City and County of Denver: and BCE Development Properties, Inc., a Colorado corporation fka Oxford Properties, Inc., Defendants–Appellees.**

Nos. 88–2599, 88–2928.

United States Court of Appeals, Tenth Circuit.

March 29, 1990.

James A. Clark, Baker & Hostetler (Bruce D. Pringle and Theodore Shih of Baker & Hostetler, Kenneth L. Starr and Michael Touff of Holmes & Starr, with him, on the briefs), Denver, Colo., for plaintiffs-appellants.

David R. Hammond, Davis, Graham & Stubbs (Dale R. Harris and Neil Peck of Davis, Graham & Stubbs, Stephen H. Kaplan, City Atty., Robert M. Kelly, Donald E. Wilson, and Karen A. Aviles, Asst. City Attys., Marlin D. Opperman, William M. Schell and Linda A. Surbaugh of Opperman & Associates, P.C., with him, on the briefs), Denver, Colo., for defendants-appellees.

Before McKAY, MOORE, and ANDERSON, Circuit Judges.

JOHN P. MOORE, Circuit Judge.

Plaintiffs-appellants appeal a summary judgment order which dismissed with prejudice all of their antitrust and civil rights claims against the defendants. We conclude that the district court properly found that there was no genuine issue of material fact in dispute. Because that court correctly applied the substantive law, we affirm.

I.

This case arises from the proposed Centerstone redevelopment project in downtown Denver. The plaintiffs-appellants, the Oberndorf family and Block 173 Associates (landowners), opposed the project which would have been constructed in part on their land.[1] The landowners also objected to the corresponding urban renewal plan adopted by the Denver Urban Renewal Authority (DURA) and the Denver City Council from which the Centerstone project emanates. The defendants-appellees are the City and County of Denver (the City), the City Council, Federico Pena, the Mayor of the City and County of Denver, Colorado, DURA, (collectively the Municipal defendants); and BCE Development Properties, Inc. (BCED). Seeking injunctive relief, a declaratory judgment, and damages, landowners claim alleged antitrust violations based on §§ 1 and 2 of the Sherman Anti-Trust Act, 15 U.S.C. §§ 1 and 2 and alleged civil rights claims under 42 U.S.C. § 1983. The district court's thorough recitation of the facts of this case obviates further recitation here. See *Oberndorf v. City and County of Denver*, 696 F.Supp. 552, 554–56 (D.Colo.1988). Therefore, we set out only those facts which are essential for this opinion.

In early 1983, the City and the Denver Partnership, Inc. (DPI), a non-profit civic and downtown business organization, began courting national retail developers and department stores in an effort to revitalize downtown Denver. City officials and DPI determined that some sort of public/private partnership with substantial public financing would be necessary to create a multi-block retail project on the Sixteenth Street Mall. In the summer of 1983, DPI formed the Sixteenth Street Retail Development Task Force to assist in forming such a partnership. Although the City and DPI contacted several potential developers, only BCED demonstrated sufficient interest and capacity to develop such a project. BCED proposed a two or three-block project to be constructed on Blocks 196, 173, and 206, including the block on which an existing department store is now located.

Following a December 1984 announcement by Mayor Pena and BCED about the proposed Centerstone project, discussions

1. Subsequent events call into question whether the project will be completed, but neither party has suggested this case is consequently moot.

among the City, BCED and others continued, focusing on available forms of public financing. It was determined that the best method was "tax increment financing," a form of public funding that allows sale of municipal bonds to raise money for public improvements. Under Colorado law, this funding vehicle is available only as part of an urban renewal plan. *See Urban Renewal Auth. v. Byrne,* 618 P.2d 1374 (Colo. 1980). The City began taking actions to adopt an urban renewal plan as set forth at Colo.Rev.Stat. §§ 31–25–101 to 31–25–115 (1986).

Critical to the entire project are the provisions of Section 31–25–107(1) that no urban renewal plan shall be undertaken unless the appropriate authority, here the City Council, determines that the area is blighted. In December 1985, the City Council passed a resolution ordering DURA to begin preparing an urban renewal plan and conducting a blight study to analyze a fifteen-block area in downtown Denver. In March 1986, the study concluded, finding numerous blight factors existed in the defined space. DURA also prepared a proposed urban renewal plan for the fifteen-block area.

In May 1986, the City Council considered the proposed urban renewal plan at a public meeting. Landowners and their representatives appeared and opposed the plan, disputing the existence of blight in the area. Enacting Ordinance 309, the City Council approved the plan.

In August 1987, DURA issued an Offering Prospectus and solicited proposals from prospective developers for redevelopment of all or part of the fifteen-block urban renewal area. Four prospective developers submitted proposals, but only those of BCED concerned the blocks on which BCED hoped to build the Centerstone project. DURA selected BCED and Centerstone for Phase I of the urban renewal plan.

Landowners then began this action, claiming the defendants illegally conspired to misrepresent the three-block area as blighted so that the property could be condemned under the Colorado Urban Renewal Law. They further claimed the urban renewal plan eliminated competition among buyers and developers in the three-block real estate market and thus amounted to a restraint of trade in violation of §§ 1 and 2 of the Sherman Anti–Trust Act. Landowners also asserted claims under 42 U.S.C. § 1983 that the plan was a regulatory taking of property in violation of the due process and equal protection clauses of the Constitution.

Following discovery, all defendants filed summary judgment motions which the district court granted, dismissing all of the landowners' claims with prejudice. *Oberndorf,* 696 F.Supp. at 561. Shortly thereafter, the district court granted defendant DURA's motion to dismiss its counterclaims, and final judgment was entered for the defendants and against landowners. The landowners appeal the summary judgment order.

## II.

This court reviews a summary judgment order *de novo. Burnette v. Dow Chemical Co.,* 849 F.2d 1269, 1273 (10th Cir.1988). We review the record in the light most favorable to the non-moving party to determine if a genuine issue of material fact was in dispute; if not, we must determine if the substantive law was correctly applied. *Osgood v. State Farm Mut. Auto. Ins. Co.,* 848 F.2d 141, 143 (10th Cir.1988).

### A. STATE ACTION IMMUNITY UNDER ANTITRUST LAWS

In *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Supreme Court held that the Sherman Act did not apply to the anticompetitive conduct of a state acting through its legislature. Subsequently, the Court rejected the proposition that municipalities are similarly immune from antitrust liability simply by their status as subdivisions of the state. *City of Lafayette, La. v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978). Rather, to obtain exemption, municipalities must demonstrate that their anticompetitive activities were

authorized by the state "pursuant to a state policy to displace competition with regulation or monopoly public service." *Id.* at 413, 98 S.Ct. at 1137. The municipality need not point to a specific, detailed legislative authorization, but must show that it acted in accordance with a "clearly articulated and affirmatively expressed ... state policy" to displace competition with regulation. *Id.* at 410, 415, 98 S.Ct. at 1135, 1138. *See also Community Communications Co. v. City of Boulder, Colo.,* 455 U.S. 40, 51–52, 102 S.Ct. 835, 840–841, 70 L.Ed.2d 810 (1982). "A state policy is considered clearly articulated and affirmatively expressed if the statutory provision empowering the municipality's action plainly shows that 'the legislature contemplated the kind of action complained of.'" *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 44, 105 S.Ct. 1713, 1719, 85 L.Ed.2d 24 (1985) (quoting *City of Lafayette, La.,* 435 U.S. at 415, 98 S.Ct. at 1138).

The district court found the cited actions of the defendants complied with the requirements of the Colorado Urban Renewal Law and were undertaken pursuant to a clearly articulated and affirmatively expressed state policy as embodied in that law. Therefore, the district court held that the defendants were immune from liability and granted summary judgment. In addition, the court found that the evidence of conspiracy produced by the landowners did not reach the required threshold level and that the undisputed evidence indicated that the defendants' actions were consistent with their permissible independent interests in pursuing the Centerstone project as an effort to revitalize the Denver economy.

Arguing that the district court refused to consider evidence that the legislative record was a sham, landowners contend that the district court applied the wrong legal standard by limiting consideration to a facial review of the legislative record made by the City Council and DURA. We conclude that the district court adequately considered all of the evidence and affirm the district court's holding that state action immunity protects the Municipal defendants and BCED.

■ Under the tests pronounced in *City of Lafayette* and *Boulder, supra,* we must consider two prerequisites to proper application of the state action exception to municipal action. We must first determine whether the Colorado General Assembly, through the Colorado Urban Renewal Law, authorized the challenged actions of the defendants. In addition, we must determine whether the legislature intended to displace competition with regulation. *See* P. Areeda & H. Hovencamp, *Antitrust Law* ¶ 212.3a (Supp.1988). In this case, it is undisputed that the Colorado Urban Renewal Law represents a clearly articulated and expressly stated policy to displace competition. *See, e.g., Rabinoff v. District Court In and For City and County of Denver,* 145 Colo. 225, 234, 360 P.2d 114, 119 (1961) (describing how the Colorado Urban Renewal Law operates by condemnation of private property for public use or transfer to private ownership to be used for public purposes); *c.f. Scott v. City of Sioux City, Iowa,* 736 F.2d 1207, 1213 (8th Cir.1984) (discussing how Iowa legislation contemplated that competition would be displaced by the operation of the Iowa urban renewal law), *cert. denied,* 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985). Therefore, the focus of the inquiry is whether the City's actions were authorized by the Colorado Urban Renewal Law.

■ To support their contention that the City acted beyond the scope of the statute, landowners claim that defendants were not attempting to eliminate blight as required by the Colorado Urban Renewal Law. Specifically, landowners point out that no blight was found on the three downtown blocks which would compose Centerstone. They allege that defendants expanded the target area to fifteen blocks to compensate for the lack of blight in Blocks 173, 208 and 196. Landowners claim that the larger area was needed to generate tax increment financing funds necessary to deliver the approximately $60 to $80 million subsidy to BCED. In addition, landowners contend the Centerstone committee chose the larger area to avoid anticipated adverse changes to the tax-exempt status of bonds brought

about by the 1986 Tax Reform Act. Landowners allege the Centerstone committee was counseled that a smaller district, directed only at Centerstone, might be declared illegal; hence, it chose to expand the area to be developed. After reviewing the record, we conclude that the lack of blight on the Centerstone blocks and the landowners' asserted reasons defendants created the fifteen-block area are not sufficient to prove the blight study was a sham. We agree with the district court that the blight study comported with the statutory definition of "blighted area" as set forth in Colo.Rev.Stat. § 31–25–103(2) (1986). As the district court explained, blight need not exist on every block of the area examined. As interpreted by the Colorado Court of Appeals, the statutory definition of blight "is broad and encompasses not only those areas containing properties so dilapidated as to justify condemnation as nuisances, but also envisions the prevention of deterioration." *Tracy v. City of Boulder*, 635 P.2d 907, 909 (Colo.App.1981).

Claiming that BCED was selected as the developer of Centerstone long before the use of urban renewal was even contemplated, the landowners contend the selection procedure illustrates how the use of urban renewal was a sham. Landowners argue that the usual process of urban renewal requires that a developer be selected after council adoption of a plan and through a competitive bidding process.

Rejecting this contention, the district court held the fact that "defendant BCED may have been identified as the 'first choice' developer of the Centerstone Project before the financing method was selected and before the blight study was conducted, does not violate any statutory provision with respect to implementation of an urban renewal plan under Colorado law." *Oberndorf*, 696 F.Supp. at 559. We agree. Following the adoption of the urban renewal plan according to the procedures of Colo.Rev.Stat. § 31–25–107, DURA sent out a prospectus and conducted a competitive bidding process as described in Colo.Rev.Stat. § 31–25–106(2) (1986). DURA's selection of BCED does not by itself show that the process was a sham.

Furthermore, the realities of the urban renewal process require early developer involvement to determine whether a public/private partnership is feasible. Consultation with BCED and other developers before the adoption of the urban plan merely gave the City information whether urban renewal and tax increment financing were appropriate mechanisms for revitalizing this section of downtown Denver.

Finally, landowners allege other indications that the Centerstone committee accomplished its goals in a dishonest manner. They suggest that at least one council member may have received financial gain from BCED. In addition, they contend that BCED "misrepresented" to the council its plans for condemnation and misled the public by the $60 to $80 million figures identified as the City's commitment when, in fact, the subsidy could be as much as $216.8 million of revenues otherwise available to the City. However, these allegations are not supported by sufficient evidence nor do landowners show how these instances of misrepresentation relate to their claims that the urban renewal plan was not authorized by state law. We agree with the district court that the Colorado Urban Renewal Law grants municipal officials authority to combat blight and authorizes DURA to facilitate redevelopment through urban renewal plans.

Because we affirm the district court's finding that the Municipal defendants were authorized by and acted in accordance with this affirmatively expressed state policy, we affirm the district court's conclusion that state action immunity applies.

## B. *NOERR–PENNINGTON* DOCTRINE

Even assuming that the landowners have shown evidence of conspiracy and antitrust injury, the *Noerr–Pennington* doctrine provides immunity to BCED in this case. Based upon the protections of the First Amendment, the *Noerr–Pennington* doctrine exempts from antitrust liability any legitimate use of the political process by private individuals, even if their intent is to eliminate competition. *United Mine Work-*

*ers of Am. v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). In its summary judgment order, the district court implicitly held that BCED's activities were "mere solicitation of government action" protected by the *Noerr–Pennington* doctrine. We agree.

■ Immunity under the *Noerr–Pennington* doctrine is designed to protect the right to petition and engage in political activity. *Instructional Systems Dev. Corp. v. Aetna Cas. & Sur. Co.,* 817 F.2d 639, 650 (10th Cir.1987). *Noerr–Pennington* protects rights of association and petition, which would be denied if groups with common interests could not, without violating the antitrust laws, use the channels and procedures of government agencies to advocate their causes and points of view respecting resolution of their business and economic interests *vis-a-vis* their competitors. *California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510–11, 92 S.Ct. 609, 611–12, 30 L.Ed.2d 642 (1972).

■ In this case, the actions of BCED fall squarely within the doctrine. When BCED participated in the Centerstone committee and met with City Council members, BCED merely represented its own business and economic interests in the proposed revitalization of downtown Denver. BCED's project proposals, models of Centerstone, comments on tax increment financing, and meetings with city officials were a legitimate use of the political process and the very kind of speech protected by *Noerr–Pennington.*

In *Boone v. Redevelopment Agency of San Jose,* 841 F.2d 886 (9th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 489, 102 L.Ed.2d 526 (1988), the Ninth Circuit considered similar antitrust allegations that a developer and city officials had shadowy secret meetings and covert agreements in connection with the amendment of an urban renewal plan. The Ninth Circuit held that the conduct was protected by *Noerr–Pennington,* explaining that "[t]he

redevelopment process by its very nature, allows for ex parte deliberations between decisionmakers and advocates of a particular view." *Id.* at 895.

We reject landowners' contentions that BCED's conduct falls within two exceptions to *Noerr–Pennington immunity.*

### 1. Co-conspirator exception

■ Landowners argue that this court should adopt a "co-conspirator" exception to *Noerr–Pennington* and deny private participants protection where government officials or entities are co-conspirators in a scheme violative of the antitrust laws. *See Affiliated Capital Corp. v. City of Houston,* 735 F.2d 1555, 1566 (5th Cir.1984), *cert. denied,* 474 U.S. 1053, 106 S.Ct. 788, 88 L.Ed.2d 766 (1986), and *Duke & Co., Inc. v. Foerster,* 521 F.2d 1277, 1281–82 (3d Cir.1975). However, *Noerr–Pennington* cannot be circumvented by merely alleging that a government official was involved in the alleged conspiracy. *Boone,* 841 F.2d at 897. We agree with the district court's conclusion that the landowners have not submitted any evidence indicating that any "deal" was made, bribe taken, or illegal conspiracy formed between the Municipal defendants and BCED. The landowners' allegations of secret meetings and covert agreements between the City and BCED are not supported by sufficient evidence of a conspiracy such that a possible co-conspirator exception be considered. Therefore, we need not address whether to adopt a "co-conspirator" exception to *Noerr–Pennington.*

### 2. "Illegal Activity" exception

■ In addition, landowners argue that *Noerr–Pennington* immunity should not be extended because BCED engaged in illegal or fraudulent activities separate and apart from any lobbying activities. *Noerr–Pennington* does not provide immunity where legitimate lobbying efforts are accompanied by illegal or fraudulent actions. *See Westborough Mall, Inc. v. City of Cape Girardeau, Mo.,* 693 F.2d 733, 746 (8th Cir.1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2122, 77 L.Ed.2d 1303 (1983).

Landowners allege that BCED entered into covert agreements with the City which were unlawful and an abuse of the power delegated to the City under the Urban Renewal Law. Therefore, they contend that BCED cannot take advantage of *Noerr–Pennington.*

The district court correctly held that the state legislature authorized defendants' actions, and, consequently, there was no illegal activity. Moreover, alleged violation or misuse of an urban renewal law does not constitute the kind of illegal activity which can deprive a private party of *Noerr–Pennington* protection. *See Boone,* 841 F.2d at 891, 893–97 (affirming dismissal based on *Noerr–Pennington* doctrine despite allegations that the redevelopment law was illegally used to redevelop non-blighted area). Although bribery, or misuse or corruption of governmental processes are outside the protection of the *Noerr–Pennington* doctrine, *Instructional Systems Dev. Corp. v. Aetna Cas. and Sur. Co.,* 817 F.2d at 650, landowners do not allege any of these illegal activities.

## C. CIVIL RIGHTS CLAIMS

The district court granted summary judgment in favor of defendants on landowners' civil rights claims, finding that there was not enough evidence to support their claim for a violation of civil rights and that the City's condemnation of plaintiffs' property was rationally related to a public purpose. Relying upon *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954), the district court concluded the adoption of an urban renewal plan was a legislative act and that in order to establish an unconstitutional "taking," the landowners had to establish that no public purpose existed for the proposed urban renewal project. Because the district court found that the urban renewal plan was rationally related to the economic revitalization of downtown Denver, the district court held that no unconstitutional "taking" of landowners' property occurred.

Landowners appeal this ruling, arguing that the proper inquiry was whether the urban renewal plan sought to accomplish the purpose authorized by the Colorado Urban Renewal Law. Claiming that the district court's ruling ignored legal distinctions between states and municipalities, landowners contend that state authorization is an essential issue because cities are not entitled to the same deference as states.

We reject these arguments. The district court applied the proper standard when it inquired whether a proper purpose existed for the urban renewal plan, which was created by the legislative acts of DURA and the City Council. Whether the action was authorized by state law is a separate issue and is not part of the inquiry before the court when it looks for a rational relationship to a legitimate public purpose.

The Supreme Court has held that the adoption of an urban renewal plan is a legislative act which must be upheld if there is any public purpose underlying it: "But the means of executing the project are for [the legislature and the legislature] alone to determine, once the public purpose has been found." *Berman v. Parker,* 348 U.S. at 33, 75 S.Ct. at 103. In *Rosenthal & Rosenthal Inc. v. New York State Urban Dev. Corp.,* 771 F.2d 44 (2d Cir.1985), *cert. denied,* 475 U.S. 1018, 106 S.Ct. 1204, 89 L.Ed.2d 317 (1986), the Second Circuit affirmed the dismissal of a civil rights suit that sought to enjoin the condemnation of plaintiffs' land under an urban renewal plan. Claiming that their property was in no way blighted, these plaintiffs alleged that a private real estate developer, an urban renewal agency, and various city officials violated plaintiffs' civil rights by wrongfully including plaintiffs' land in an urban renewal plan. The Second Circuit affirmed the dismissal of the complaint, holding that so long as the urban renewal legislation was "rationally related to a conceivable public purpose," the plan was valid and did not violate plaintiffs' civil rights. *Rosenthal & Rosenthal Inc.,* 771 F.2d at 46. The Ninth Circuit reached the same conclusion in *Boone v. Redevelopment Agency of San Jose,* 841 F.2d at 892–93, rejecting equal protection and due process challenges to an urban renewal plan:

[Plaintiffs] have not alleged that the interest of the city and agency in urban redevelopment is illegitimate. Such a claim would be patently frivolous. Moreover, the municipality's regulation of parking is facially "rationally related" to the ends of urban renewal. Thus we find no violation of the [plaintiffs'] equal protection or substantive due process rights.

*Accord Scott v. City of Sioux City, Iowa,* 736 F.2d at 1216 (affirming summary judgment on substantive due process and equal protection claims because there was a public purpose for the challenged urban renewal ordinance).

The district court also properly concluded that elimination of urban blight and economic revitalization of Denver were legitimate public purposes underlying the plan. In reviewing whether legislative power is exercised for a public purpose, this court exercises narrow authority. "It is not for the court to oversee the choice of the boundary line nor to sit in review on the size of a particular project area." *Berman, supra,* 348 U.S. at 35–36, 75 S.Ct. at 103–104. Colorado has long recognized that the acquisition of property for the planned elimination of urban blight constitutes a public purpose. *Rabinoff v. District Court,* 145 Colo. at 234, 360 P.2d at 119. Similarly, in *Thornton Development Authority v. Upah,* 640 F.Supp. 1071 (D.Colo.1986), the court upheld the condemnation of the plaintiff's land for urban renewal because statutorily recognized public purposes were the stated basis for the Thornton Development Authority's action. The court explained, "In this case such public purposes as increasing revenues, sales, commerce and employment cannot be gainsaid. The wisdom of decisions made in effectuating such purposes is not a matter given to the courts in our system to consider." 640 F.Supp. at 1081.

Landowners also argue that the district court improperly concluded that the landowners' claims that the defendants violated the Colorado Urban Renewal Law belong in state court and not in federal court. The district court ruled that wheth-

er defendants' actions complied with every detailed provision of the Urban Renewal Law in this instance was not properly before it in the context of the federal claims asserted. We agree with the district court that the violation of state law, if any, does not necessarily constitute a violation of the plaintiffs' constitutional claims. *Rosenthal & Rosenthal Inc.,* 605 F.Supp. at 618 (S.D.N.Y.), *aff'd,* 771 F.2d 44 (2d Cir.1985), *cert. denied,* 475 U.S. 1018, 106 S.Ct. 1204, 89 L.Ed.2d 317 (1986). Similarly, we agree that the defendants "do not forfeit their immunity [under antitrust laws] merely because their execution of the powers granted to them under the redevelopment act may have been imperfect in operation." *Boone,* 841 F.2d at 892; *see also* P. Areeda & H. Hovencamp, *supra,* at ¶ 212.3b.

Although landowners allege that the public purposes set forth for the plan are fraudulent and that the Plan favored BCED, we do not find sufficient evidence in the record to support the landowners' claim for a violation of civil rights or their claim of conspiracy. The district court's order granting summary judgment is AFFIRMED.