No. 25467

Nopro Co., a Colorado corporation v. The Town of Cherry Hills Village, a municipal corporation existing under and by virtue of the laws of the State of Colorado

(504 P.2d 344)

Decided December 18, 1972.     Rehearing denied January 8, 1973.

Dayton Denious, William P. Denious, for plaintiff-appellee.

Van Cise, Freeman, Tooley & McClearn, Edwin P. Van Cise, for defendant-appellant.

*En Banc.*

MR. JUSTICE LEE delivered the opinion of the Court.

Appellant seeks to reverse an adverse judgment of the district court of Arapahoe County which declared the Cherry Hills Village zoning ordinance unconstitutional as applied to appellee's property. We reverse the judgment.

The controversy arose out of the refusal by the Cherry Hills Planning Commission to approve a proposed development of a 77-acre tract, known as the "Work property," into single-family building sites smaller than are permitted by the applicable R-1, Residential One District, zoning restrictions. R-1 zoning permits single-family dwellings on sites of not less than 2-1/2 acres. Appellee sought a density development which would approximate twice that permitted by the ordinance, 1.3 acres per dwelling unit as compared with 2.5 acres. Failing in its application to the Planning Commission, appellee commenced this action in the Arapahoe County District Court, seeking a declaration of unconstitutionality of the R-1 zoning classification as applied to its property.

I.

The basic factual matters are not in dispute. Cherry Hills Village was incorporated in 1945. By its ordinance No. 9, Series of 1945, it zoned the entire Village, including the

Hubert Work property which was within the original municipal boundaries. This property is located on the east side of University Boulevard approximately midway between Hampden Avenue on the north and Quincy Avenue on the south. The Cherry Hills Country Club is located directly across University Boulevard on the west.

The Work property was described as being in the "heart" of the Village. It and the immediately adjoining properties on the north, east, and south, were all initially zoned R-1, requiring 2-1/2 acres per building site. Although the ordinance was amended in 1956, the Work property and those adjacent to it retained their R-1 zoning, except as hereinafter noted.

At the time of appellee's application for rezoning, the Work property remained undeveloped except for a residence and outbuildings on the east end of the tract, occupying approximately 2.7 acres. This tract had been sold, and is not involved in this action. The lands directly east, extending to Colorado Boulevard, and directly south, extending to Stanford Avenue, are still zoned R-1. These have been substantially developed into single-family residences on tracts, many of which under subdivision protective covenants are as large as 5 acres in size.

The property adjacent to the Work property on the north is known as the Buell property and consists of 160 acres. It is as yet undeveloped. The Buell property remains zoned R-1 where it borders the north boundary of the Work property and the subdivision lying to the east known as Devonshire Heights. On the west, along University Boulevard, it is zoned R-1 for a distance of approximately sixteen hundred feet north of the Work property. The northwest portion of the Buell property, bordering on Hampden Avenue and extending southerly to within 430 feet of the Work property, was rezoned as RA-1, Resort Area District. This zoning classification permits a residential and resort hotel development, including retail shops and restaurants as a part of the hotel structure. The RA-1 regulation provides that no more than ten percent of the RA-1 land may be occupied by buildings

or structures of any type.

The quarter section of land directly west of the Buell property across University Boulevard is also zoned R-1.

To the northeast of the Work property lies the Devonshire Heights subdivision. This subdivision was not originally in Cherry Hills Village but was annexed under an agreement with the owner which permitted a platting into sites averaging 1.3 acres in size, zoned as R-1B, Residential One-B District. Those sites on the south nearest the Work property are approximately 2.4 acres in size. The smaller sites are on the north and border on Hampden Avenue.

Across University Boulevard to the west, and adjoining Cherry Hills Country Club on the north and south, lie subdivisions bordering portions of the golf course. These are zoned R-2, Residential Two District, requiring minimum sites of one acre. However, as platted, the tracts are considerably larger than one-acre plots.

The Village zoning ordinance contains additional zoning classifications: R-1A, Residential One-A District, which allows sites of 1-1/4 acres; R-3, Residential Three District, which allows sites of 1/2 acre; and R-3A Residential Three-A District, which allows sites of 16,000 square feet. The smaller tract zones are generally located on the perimeter of the Village and are areas which were subsequently annexed to the Village after its original incorporation. They adjoin other developments outside the Village, with less restrictive zoning requirements, such as Englewood on the west and north, and Denver on the north and east.

Greenwood Village lies to the south of Cherry Hills Village and is also zoned as a low density area and has been so developed.

The record establishes that Cherry Hills Village was zoned pursuant to a master plan as a "green belt" area of low density with large building sites. It has been so developed with the construction of larger homes in reliance on the stability of the master plan and the zoning ordinances. The Denver metropolitan area land use plan, formulated by the Denver Regional Council of Governments, formerly the

Inter-County Regional Planning Commission, also shows Cherry Hills and Greenwood Village as a green belt area of the lowest density residential development.

The road system of Cherry Hills is generally a network of two-lane winding roads. Efforts have been made to prevent high capacity roadways from entering into or going through the Village. The only major high capacity roadway running through the Village is University Boulevard, a divided highway running north and south and serving as a major traffic artery from Denver south to the Douglas County line. Hampden Avenue, a similar roadway running east and west, borders the Village on the north.

## II.

In 1960, Nopro engaged the services of a land planning firm, which made extensive studies of the Nopro property and its potential as a residential development. With the expert advice and consultation of this firm and with full knowledge of the Cherry Hills zoning restrictions, Nopro purchased the subject property in March of 1961 for $300,000. The easterly 2.7 acres, including the residence and appurtenant outbuildings, were sold in 1962 for $53,500. Nopro determined that the best development of the remaining land would be a "planned unit development" encompassing about two thirds of the tract, by which a total of sixty-two sites, varying in size from 1/2 to 3/4 acres each, could be developed in clusters of four to five sites. The remaining one-third of the land would be platted and developed as common ground for use of the resident-owners. The maintenance of the common ground would be handled through an association of the resident-owners.

Application for the necessary zoning revision to permit this development was made to the Cherry Hills Planning Commission. The proposed plan would have resulted in increased zoning density of approximately one site per 1.3 acres, as contrasted with the existing R-1 zoning density of one site per 2.5 acres.

Nopro admitted that under existing zoning R-1 restrictions the property could be developed feasibly and profitably into

thirty 2-1/2-acre sites and sold for approximately $20,000 per site, or a total of $600,000. However, if allowed to plat the land into sixty-two 1.3-acre sites, the property could be sold more rapidly and at approximately the same price per site, for a total of $1,200,000, thus doubling the gross profit to Nopro. Expert testimony was presented concerning the desirability of such a planned unit development and, while the Planning Commission was not opposed to such a development design, it rejected 1.3-acre proposed density as incompatible with the already developed R-1 zoned subdivisions adjoining the subject property.

### III.

Although this action was commenced in August of 1963, negotiations continued between Nopro and Cherry Hills officials to resolve the zoning controversy. Eventually, almost six years later, trial was commenced in March of 1969. At the conclusion of Nopro's evidence, appellant's motion to dismiss was denied. The court then adjourned the trial and it was not again resumed until November of 1971, when appellant presented its defense.

The trial court entered extensive written findings and conclusions and decided the controversy in favor of Nopro, declaring the zoning ordinance to be unconstitutional as applied to Nopro's property. The court enjoined the Cherry Hills Council (Board of Trustees) from enforcing the zoning ordinance as applied to Nopro's property. It specifically retained jurisdiction over the parties, and remanded the matter to the Council with instructions to adopt zoning provisions within 180 days, permitting development of Nopro's property for single-family use upon a density consonant with that permitted in Devonshire Heights or, in the event of noncompliance with the Council, the court would "* * * further determine what may be requisite and necessary to comply with the declaration, order, judgment, and decree herein made."

### IV.

Without attempting to paraphrase the court's detailed findings, we understand the court's decision to be based upon

three basic conclusions: first, that the R-1 zoning as applied to Nopro's property did not bear any reasonable relationship to the public health, safety, morals or welfare, and therefore was an unreasonable exercise of police power; second, that such zoning resulted in a substantial hardship to Nopro; and, third, that Nopro was denied equal protection of the laws in that the adjoining districts permitted higher density development per acre than that permitted in the R-1 district. We disagree with the court's conclusions and reverse the judgment.

It is fundamental that zoning is a legislative function delegated by' statute to local legislative bodies of statutory cities and towns. C.R.S. 1963, 139-60-1, *et seq.* The grant of power defines the zoning purposes and objectives to be obtained.

"For any or all of said purposes the local legislative body may divide the municipality into districts of such number, shape and area as may be deemed best suited to carry out the purposes of this article; and within such districts it may regulate and restrict the erection, construction, reconstruction, alteration, repair or use of buildings, structures or land. All such regulations shall be uniform for each class or kind of buildings throughout each district but the regulations in one district may differ from those in other districts." C.R.S. 1963, 139-60-2.

"Such regulations shall be made in accordance with a comprehensive plan and designed to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to promote health and general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to facilitate the adequate provision of transportation, water, sewerage, schools, parks and other public requirements. Such regulations shall be made with reasonable consideration, among other things, as to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such municipality." C.R.S. 1963, 139-60-3.

Implicit in the foregoing authorization is a broad legislative discretion of how to achieve the declared objectives. *Roeder v. Miller,* 159 Colo. 436, 412 P.2d 219. As long as the zoning provisions are within the authorized purposes and conform to statutory guidelines, mere disagreement with zoning classifications and district regulations will not suffice as a reason to set them aside. In our view, the trial court misconceived its function in voiding the zoning provision under consideration as it applied to Nopro's land. As tempting as it sometimes may be, a court is without power to substitute its zoning philosophy for that of the zoning body; and this is so for practical as well as legal reasons. *Board of County Commissioners v. Thompson,* 177 Colo. 277, 493 P.2d 1358; *Garrett v. City of Littleton,* 177 Colo. 167, 493 P.2d 370; *Huneke v. Glaspy,* 155 Colo. 593, 396 P.2d 453; *Baum v. Denver,* 147 Colo. 104, 363 P.2d 688.

We do not find in the record any evidence to support Nopro's contention or the court's conclusion that the R-1 zoning regulations are an unreasonable exercise of the police power. The specific statutory grant of power authorized the Council to divide the Village into zoning districts and to impose zoning regulations in each district in accordance with the Village's comprehensive plan, for purposes, among others, of preventing overcrowding of land, avoiding undue concentration of population, conserving property values, and encouraging the most appropriate use of the land throughout the Village, consistent with the Village plan as adopted by incorporators of the Village.

The history of the Village incorporation and its purposes, as embodied in its comprehensive Village plan, shows that Cherry Hills was incorporated with the express desire and purpose of protecting the inhabitants in the maintenance of a rural atmosphere consisting of small farms and large residential tracts, where farm animals and poultry would be permitted, bridle and walking paths be provided, open space be preserved and noise and traffic congestion be eliminated — all such purposes being expressly or implicitly authorized by statute. To these legitimate ends the Village was incorporated

and zoned. We cannot say that the zoning plan — particularly as applied to Nopro's property — is not reasonably calculated to promote the statutorily authorized objectives.

Contrary to Nopro's contentions, the evidence does not show that the Village has been developed otherwise than as planned, nor has the character of use of the lands changed or deviated in any substantial manner from the plan adopted, particularly in the "heart" of the Village where the subject land is located and where R-1 zoning has been continuously maintained since the date of incorporation in 1945. Additionally, the owners of the adjoining R-1 zoned properties protested against the proposed zoning change by Nopro. The maintenance of stability in zoning and resulting conservation of property values based upon existing zoning regulations are prime considerations in denying applications for zoning changes. *Roosevelt v. Englewood,* 176 Colo. 576, 492 P.2d 65; *Nirk v. Colorado Springs,* 174 Colo. 273, 483 P.2d 371; *Clark v. Boulder,* 146 Colo. 526, 362 P.2d 160; *Holly, Inc. v. Commissioners,* 140 Colo. 95, 342 P.2d 1032.

To be sure, Nopro's expert evidence indicated that the highest and best use of the property — certainly the most profitable — might be a planned unit development allowing clustered sites of smaller dimensions than R-1 zoning permitted. However, validity of zoning regulations has never been determined by the highest and best use concept or in terms of dollars and cents profitability. *Wright v. City of Littleton,* 174 Colo. 318, 483 P.2d 953; *Nirk v. City of Colorado Springs, supra; Madis v. Higginson,* 164 Colo. 320, 434 P.2d 705; *Denver v. American Co.,* 150 Colo. 341, 374 P.2d 357; *Frankel v. Denver,* 147 Colo. 373, 363 P.2d 1063; *Baum v. Denver,* 147 Colo. 104, 363 P.2d 688.

Finally, this Court has often announced the fundamental rule that to sustain an attack upon the validity of a zoning limitation, the aggrieved property owner must show that the enforced restriction upon his property will preclude its use for any purpose to which it is reasonably adapted. Accordingly, where the reasonableness of a zoning ordinance is fairly debatable, it must be upheld. *Madis v.*

*Higginson, supra; Huneke v. Glaspy,* 155 Colo. 593, 396 P.2d 453; *Baum v. Denver, supra.*

The substantial hardship conclusion reached by the trial court finds no support in the record. Nopro's land investment was made in full knowledge of the zoning limitations. It took the calculated risk that it could break the zoning use barrier and thereby double the profit from its investment. Having been denied the means by which this might be accomplished, it claims hardship. If hardship exists under the facts of this case — and we hold that it does not — it was incurred voluntarily by the choice of Nopro and was self-inflicted. *Denver v. McDonald's Corp.,* 177 Colo. 1, 491 P.2d 1375; *Nirk v. Colorado Springs, supra; Madis v. Higginson, supra; Levy v. Board of Adjustment,* 149 Colo. 493, 369 P.2d 991. Without in any way derogating acceptance of the profit motive, there is simply no constitutionally protected right under the federal or state constitutions to gain the maximum profit from the use of property. *Madis v. Higginson, supra; Village of Euclid v. Ambler,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303.

Lastly, we hold erroneous the trial court's conclusion that the enforcement of the R-1 zoning would deny Nopro equal protection of the laws. The statute specifically authorizes the division of a municipality into districts of such number, shape and area as may be deemed best suited to carry out the purposes of the statute. C.R.S. 1963, 139-60-2. It requires that all regulations shall be uniform for each class throughout a district. However, it permits regulations in one district to differ from those of another district. Here, there was no showing of discrimination against Nopro within its class, Residential One District. The fact that adjoining properties in other districts may be put to different and possibly more advantageous uses does not afford a basis for concluding there is a denial of equal protection of the laws. *Roeder v. Miller,* 159 Colo. 436, 412 P.2d 219; *Denver v. American Co.,* 150 Colo. 341, 374 P.2d 357; *Baum v. Denver,* 147 Colo. 104, 363 P.2d 688. As stated in *Baum v. Denver, supra,* zoning necessarily requires the establishment

of boundary lines between different districts and the selection of the boundary line is a legislative function with which courts should not interfere. Only where the determination of the zoning authority is so unreasonable, arbitrary, capricious and unjustifiable as to amount to a violation of constitutional rights are the courts permitted to interfere.

The judgment is reversed and the cause is remanded with directions to dismiss the complaint.

MR. CHIEF JUSTICE PRINGLE did not participate.