Donald OBERNDORF, Loe Stern, Harry Paul Wertheimer, Mike Smith, Administrator of the Edith O. Wertheimer Trust, and Dottie Hammel, Plaintiffs,

v.

The CITY AND COUNTY OF DENVER, The City Council of the City and County of Denver, by its Council Members (not as individuals, but as members of the City Council), T.J. Hackworth, M.L. Sandos, Stephanie A. Foote, Paul L. Swalm, John J. Silchia, Nieves Perez McIntire, Hiawatha Davis, Jr., Salvadore Carpio, Cathy Donohue, William R. Roberts, Robert L. Crider, Cathy Reynolds, William A. Scheitler, The Denver Urban Renewal Authority, Federico Pena, Mayor of the City and County of Denver, and BCE Development Properties, Inc., a Colorado corporation, f/k/a Oxford Properties, Inc., Defendants.

BLOCK 173 ASSOCIATES, a Colorado General Partnership, Plaintiff,

v.

The CITY AND COUNTY OF DENVER, The City Council of the City and County of Denver, by its council members T.J. Hackworth, M.L. Sandos, Stephanie Foote, Paul A. Swalm, John Silchia, Nieves Perez McIntire, Hiawatha Davis, Jr., Salvadore Carpio, Cathy Donohue, William R. Roberts, Robert L. Crider, Cathy Reynolds, William A. Scheitler, The Denver Urban Renewal Authority, Federico Pena, as Mayor of the City and County of Denver, BCE Development Properties, Inc., a Colorado Corporation, f/k/a Oxford Properties, Inc., Defendants.

Nos. 86-C-1075, 86-C-1445.

United States District Court,
D. Colorado.

Sept. 19, 1988.

Harold A. Feder, Feder, Morris, Tamblyn & Goldstein, P.C., Denver, Colo., for Oberndorf plaintiffs.

James A. Clark, Bruce Pringle, Baker & Hostetler, Denver, Colo., for Block 173 Associates.

Stephen H. Kaplan, City Atty., Robert M. Kelly, Karen A. Aviles, Asst. City Attys., Denver, Colo., for Mun. defendants.

Marlin D. Opperman, Opperman & Associates, Denver, Colo., for D.U.R.A.

Dale R. Harris, David R. Hammond, Davis, Graham & Stubbs, Denver, Colo., for BCE Development.

## ORDER

CARRIGAN, District Judge.

This is an action filed by two groups of plaintiffs who own real property located in downtown Denver, Colorado, to challenge a proposed urban renewal plan. Plaintiffs Block 173 Associates ("the Block 173 plaintiffs"), a Colorado general partnership consisting of descendants of the Cheesman–Evans families, own Block 173 in fee simple. Block 173, bounded by Fifteenth Street, Glenarm Place, the Sixteenth Street Mall, and Welton Street, is now a parking lot.

The second group of plaintiffs, the Oberndorf family ("Oberndorf plaintiffs"), own a fifty percent interest, as tenants in common with BCE Development Properties, Inc., in four lots situated within Block 196, on the corner of Tremont Street and the Sixteenth Street Mall. This property is leased to small retail businesses.

Defendants are: (1) the City and County of Denver, Colorado ("City"), the City Council, and Federico Pena, the Mayor of the City and County of Denver, Colorado (collectively the "Municipal defendants"); (2) the Denver Urban Renewal Authority ("DURA"); and (3) BCE Development Properties, Inc. ("BCED"). Defendant BCED is a Colorado corporation that owns, or controls under long term leases, all of Block 196 except for the lots owned by the Oberndorf plaintiffs.

The issues before me arise out of two consolidated lawsuits filed by the named plaintiffs. A third action, *Cook et al. v. The City and County of Denver, Colorado, et al.*, Civil Action No. 86–C–1278, has been settled and dismissed.

The Oberndorf plaintiffs' complaint seeks damages for alleged antitrust and conspiracy violations based on §§ 1 and 2 of the Sherman Anti–Trust Act, 15 U.S.C. §§ 1, 2 (First Claim) and alleged civil rights violations under 42 U.S.C. § 1983 (Second Claim). It also prays for injunctive relief (Third Claim).

The Block 173 plaintiffs allege claims for violations of civil rights based on § 1983 (First and Second Claims), conspiracy to violate civil rights (Third Claim), and antitrust and conspiracy violations under the Sherman Anti–Trust Act (Fourth and Fifth Claims). They seek an injunction, declaratory judgment, and damages.

Defendants have moved for summary judgment as to all claims asserted by the plaintiffs. The issues have been fully briefed, counsel have presented extensive oral argument, and all motions are ripe for decision. Subject matter jurisdiction exists under 28 U.S.C. §§ 1331, 1343, and 15 U.S. C. §§ 1, 26.

Plaintiffs' claims arise from an urban renewal project proposed by the Municipal defendants to be constructed in part on the properties owned by the plaintiffs. Defendant BCED is the proposed developer of the project.

In early 1983, the City and the Denver Partnership, Inc. ("DPI"), a nonprofit civic and downtown business organization, began courting national retail developers and department stores in an effort to enhance and revitalize the downtown Denver area. City officials and DPI soon determined that some sort of public/private partnership, with substantial public financial involvement, would have to be formed in order to develop a multi-block retail project downtown. This conclusion was based on such factors as high land costs, lower return for retail projects than for office towers, and the need to make substantial concessions to anchor department store tenants in order to lure them to Denver.

In the summer of 1983, DPI formed the Sixteenth Street Retail Development Task Force to assist in forming a public/private partnership to construct a multi-block retail project on the Sixteenth Street Mall. Although the City and DPI contacted several potential developers, only the defendant BCED demonstrated sufficient interest and capacity to develop the desired multi-block retail project. BCED proposed a two or three block project on the Mall to be constructed on Block 196, Block 173 and the block on which the May D & F Department Store is now located. In December 1984, the defendants Mayor Pena and BCED held a press conference to announce the plans

of BCED and Reliance Development Company, (which then had the development rights to Block 173), to build the "Centerstone Project."

After this announcement, discussions among the City, BCED and others continued, focusing on available forms of public financing. It was determined that the most attractive and promising method was tax increment financing, a form of public funding that allows sale of municipal bonds to raise money for public improvements. It appears undisputed by the parties that urban renewal is the only vehicle available under Colorado law for implementing tax increment financing. *See Urban Renewal Auth. v. Byrne,* 618 P.2d 1374 (Colo.1980). Colorado's Urban Renewal Law is set forth at Colo.Rev.Stat. §§ 31–25–101 *et seq.* The City thus began taking the actions necessary to adopt an urban renewal plan.

Section 31–25–107(1) of the Urban Renewal Law provides that no urban renewal project shall be undertaken unless the appropriate authority, here the City Council, determines by resolution that the area is blighted or a slum. On December 4, 1985, the City Council's Budget and Finance Committee recommended that the City Council fund a DURA blight study to analyze a fifteen-block area in downtown Denver that was contemplated to be included in the proposed urban renewal district. On December 16, 1985, City Council Resolution No. 85 was passed at a public meeting. This resolution ordered DURA to begin preparing an urban renewal plan, and to perform a blight study for the fifteen-block area bounded by the Sixteenth Street Mall, Broadway, Cheyenne Place, Colfax and Champa Streets.

DURA solicited proposals from four consulting firms and on February 6, 1986, the DURA Board of Commissioners selected the firm of HOH Associates, Inc. ("HOH") to conduct the blight study.

In March 1986, HOH concluded its study, finding that numerous blight factors existed in the fifteen-block area. However, no blight factors were found to exist in the blocks here at issue now being considered for the Centerstone Project. These blocks, however, are part of the fifteen block area found to be blighted. HOH presented its blight study conclusions to DURA at a public meeting held March 20, 1986.

During this same period, DURA began preparing drafts of the urban renewal plan, with input from the City Council, the Mayor's office, the Denver Planning Office, various City agencies, bond underwriters, BCED and its representatives, area land owners and other interested persons. DURA's proposed urban renewal plan would create an urban renewal district covering the fifteen block area found to be blighted. It authorizes the use of tax increment bonds to finance public improvements, including retail, commercial, and related support facilities, with developers to be selected through a bidding process. Projects would be constructed pursuant to redevelopment agreements between private developers and DURA, as approved by the City Council. The plan initially gave DURA the power to condemn property but, at the insistence of certain property owners, including the plaintiffs, DURA's condemnation power was limited to the Plan's Phase I and, if the land subject to condemnation was larger than 25,000 square feet, DURA was required to obtain prior City Council approval. The initial Phase I development focused on three blocks, including the property owned by the plaintiffs and BCED.

On April 21, 1986, the Downtown Development Committee of the City Council met with the Denver School Board at a public meeting to discuss the urban renewal plan and tax increment financing. The Denver Planning Board met and reviewed the plan on May 7, 1986, voting to recommend the plan's approval to the City Council. DURA also recommended to the City Council that the plan be approved.

On May 27, 1986, after giving public notice, the City Council considered the proposed urban renewal plan at a public meeting. Plaintiffs and their representatives appeared and opposed the plan, disputing the existence of blight in the area. At the meeting's conclusion, the City Council, by a vote of nine to two, enacted Ordinance 309

approving the urban renewal plan. In the plan, DURA identified several public purposes for the plan's implementation, including renewing and improving the character and environment of the City's central business district, enhancing the sales and property tax base, providing incentive for the private development of retail shopping and commercial activity within the area, eliminating crime, and improving the economy by stabilizing and upgrading property values. In addition, certain deposition testimony elicited from the Mayor and City Council members indicated that they believed the plan was in Denver's best interest.

In August 1987, DURA issued an Offering Prospectus and solicited proposals from prospective developers for redevelopment of all or part of the fifteen-block urban renewal area. Four prospective redevelopers submitted proposals, but only BCED's proposal concerned the blocks on which BCED hoped to build the Centerstone Project. DURA selected BCED and the Centerstone Project for Phase I of the urban renewal plan.

Plaintiffs contend that the urban renewal plan eliminates competition among buyers and developers in the three-block real estate market and thus amounts to a restraint of trade in violation of §§ 1 and 2 of the Sherman Anti–Trust Act. Plaintiffs also assert that the plan interferes with their protected property rights because it amounts to a regulatory taking of property in violation of the due process and equal protection clauses of the Constitution, actionable claims under 42 U.S.C. § 1983. They further argue, with respect to these claims, that the defendants illegally conspired to misrepresent the three-block area as blighted so that the property could be condemned under the Colorado Urban Renewal Law, to BCED's benefit in pursuing the Centerstone Project.

In support of their respective summary judgment motions, the defendants generally allege that they are immune from liability under the antitrust and civil rights laws because a public purpose underlies their actions with respect to the urban renewal

project, and that their conduct occurred in the context of the legislative decision-making process pursuant to state statutory authority.

Generally, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P.; *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling on a summary judgment motion, the court must construe all pleadings, affidavits and admissions in favor of the non-moving party and that party must be given the benefit of all favorable inferences that can be drawn from the evidence. *Bruce v. Martin–Marietta Corp.,* 544 F.2d 442 (10th Cir.1976). The relevant inquiry is whether there is sufficient disagreement over the evidence to require submitting the case to trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). In *Catrett,* the United States Supreme Court held that Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. 477 U.S. at 322, 106 S.Ct. at 2552.

In the early stages of this litigation, the defendants unsuccessfully moved to dismiss all of the plaintiff's claims. *Oberndorf v. City and County of Denver,* 653 F.Supp. 304 (D.Colo.1986). Plaintiffs now have had the benefit of discovery, and their claims must be examined in the light most favorable to them based on all the evidence submitted.

### A. *Violations of the Sherman Anti–Trust Act.*

To prove a violation of § 1 of the Sherman Anti–Trust Act "unreasonable restraint of trade" prohibitions under the rule of reason analysis, there must be: (1) an agreement among two or more persons or distinct business entities; (2) that is intended to harm or unreasonably restrain competition; (3) and that actually causes

injury to the competition. With respect to the injury to competition element, the alleged illegal activities must have an impact upon competition in a relevant market. *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 290–91 (9th Cir.1979).

■ Four elements are essential to an "attempt to monopolize" claim under § 2 of the Sherman Anti–Trust Act: (1) a relevant market; (2) a dangerous probability of success in monopolizing the relevant market; (3) specific intent to monopolize; and (4) conduct in furtherance of the attempt. *Shoppin' Bag of Pueblo, Inc. v. Dillon Cos., Inc.*, 783 F.2d 159 (10th Cir.1986).

■ To establish a § 1 Sherman Act conspiracy, the evidence must indicate that the alleged conspiracy was calculated to prejudice the public interest by unduly restricting the free flow of interstate commerce. *Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 275 (5th Cir. 1979). The evidence supporting a § 2 conspiracy claim must establish an agreement, overt acts in furtherance of the agreement, and a specific intent to monopolize any part of interstate commerce. *Instructional Sys. Dev. Corp. v. Aetna Cas. & Sur. Co.*, 817 F.2d 639, 646 (10th Cir.1987).

In his opinion addressing the defendants' dismissal motions with respect to the plaintiffs' antitrust claims, Judge Kane of this court noted that it would be difficult for the plaintiffs to prove the existence of a conspiracy, or that the three block area at issue is the "relevant market" for purposes of assessing whether the defendants' actions constitute a monopoly. *Oberndorf, supra*, 653 F.Supp. at 309.

My task in deciding the defendants' motions has been made more difficult because the parties do not agree on what issues must be resolved. Defendants argue that their actions had a valid public purpose, and that the means used to achieve that purpose were lawful because they followed all statutory requirements in adopting the urban renewal plan. See brief of the Municipal defendants at 12–15.

Plaintiffs contend, however, that the issue is not whether the urban renewal plan had a legitimate public purpose. Rather, the plaintiffs argue that the defendants did not act in a manner authorized by state statute (Colorado's Urban Renewal Law) in adopting the urban renewal plan, and that the defendants are not immune from antitrust liability. In support of this argument, the plaintiffs list several acts of misconduct allegedly committed by the defendants.

The factual predicate assumed for the plaintiffs' argument is that the Centerstone Project, and its developer, the defendant BCED, were selected by the Municipal defendants before the urban renewal plan was adopted, as evidenced by Mayor Pena's press announcement. Plaintiffs argue that the the decision to use tax increment financing was made after this press announcement. They further contend that the funding decision necessitated the "blight study" because the selected financing method could not be utilized absent an urban renewal project.

Plaintiffs also contend that there were secret meetings between Centerstone's developers and the City. They further emphasize that the area surveyed for blight consisted of fifteen blocks, whereas the Centerstone project required only a two or three block area. This two or three block area, the Centerstone site, was not itself determined to be blighted in HOH's study. Nonetheless, it is argued, the defendant DURA drafted an urban renewal plan that focused on construction of the defendant BCED's Centerstone project. Thus, the plaintiffs argue, the defendants' entire decision-making process was a sham to create the illusion of complying with the statute.

Plaintiffs further emphasize that (1) BCED lobbied for the plan; (2) BCED made political contributions to the Mayor and Council members; (3) BCED drafted the plan; and (4) BCED engaged in promotional activities before the plan was approved. Plaintiffs also cite evidence that a Denver City Councilman may have received a non-disclosed seven and one-half per cent commission on $90,000 worth of business that the defendant BCED gave to a print-

ing company with whom the Councilman worked.

At oral argument, the plaintiffs asserted that the usual procedure under Colorado's Urban Renewal Law is that a deteriorating area will first be investigated, determined to be blighted or a slum, and then designated an urban renewal area for which tax increment financing is available. Proposed developers for the urban renewal area are then solicited. Here, it is argued, the usual procedure was reversed and the cited acts were accomplished by the defendants in concert to effect an illegal purpose.

The Municipal defendants argue that they are immune under *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In *Parker*, the Court held that, under the Sherman Anti–Trust Act, state officials are entitled to immunity for activities directed by the state legislature, even if those acts have anti-competitive results. *Parker* has been extended to protect municipalities. *Hoover v. Ronwin*, 466 U.S. 558, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984); *Community Communications Co. v. City of Boulder*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982). Alleged anti-competitive acts are shielded if the municipality acted pursuant to a "clearly articulated and affirmatively expressed state policy." *Hoover, supra*, 466 U.S. at 569, 104 S.Ct. at 1995; *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 83 L.Ed.2d 24 (1985); *Thornton Dev. Auth. v. Upah*, 640 F.Supp. 1071, 1080 (D.Colo. 1986).

The Municipal defendants contend that they acted pursuant to a clearly articulated and affirmatively expressed state policy because the Colorado Urban Renewal Law grants municipal officials authority to combat slums and blight. It further authorizes DURA to facilitate redevelopment through urban renewal plans.

Defendant BCED also claims immunity under *Parker* as it has been extended to suits against private developers. *See Scott v. City of Sioux City, Iowa*, 736 F.2d 1207 (8th Cir.1984); *Boone v. Redevelopment Agency of San Jose*, 841 F.2d 886 (9th Cir.1988).

█5] Defendant BCED further relies on the *Noerr–Pennington* doctrine, which provides that certain private concerted activities aimed at influencing state action do not violate the Sherman Anti–Trust Act. *Eastern Railroad President's Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). Under this doctrine, mere solicitation of government action, even if the sole purpose is to restrain competition, is fully protected by the First Amendment. *Noerr, supra*, 365 U.S. at 138, 81 S.Ct. at 530. However, immunity is not afforded if the defendant's actions bar the plaintiff's access to administrative or judicial proceedings. *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 511, 92 S.Ct. 609, 612, 30 L.Ed.2d 642 (1972).

The *Noerr–Pennington* doctrine applies to legislative proceedings involving urban renewal. "[C]ultivating close ties with government officials is the essence of lobbying" and does not take the plaintiff's claims outside of *Noerr–Pennington*. *Boone, supra*, 841 F.2d at 894–95. Even unethical conduct aimed at influencing city council members has been held immune from suit under the antitrust laws "when conducted in the context of lobbying the City Council as a legislative body." *Rural Electric Co. v. Cheyenne Light, Fuel and Power Co.*, 602 F.Supp. 105, 109 (D.Wyo. 1983).

█6] Colo.Rev.Stat. §§ 31–25–101, *et seq.* set forth the steps necessary to create an urban renewal district and to adopt an urban renewal plan. The undisputed evidence indicates that the defendants facially complied with all statutory requirements.

Initially, § 31–25–106 provides that the City may transfer or otherwise dispose of real property acquired by it, for urban renewal purposes, to private persons under reasonable competitive bidding procedures. Thus this section contemplates the kind of public/private partnership employed by the Municipal defendants to develop the Centerstone Project.

The determination of blight with respect to the fifteen block area comports with the statutory definition of "blighted area" as set forth in § 31–25–103(2). The statute does not require the existence of blight in every block of the area examined. The definition "is broad and encompasses not only those areas containing properties so dilapidated as to justify condemnation as nuisances, but also envisions the prevention of deterioration." *Tracy v. City of Boulder*, 635 P.2d 907, 909 (Colo.App.1981).

The proposed plan was reviewed with the City School Board and Planning Commission, and a public hearing was held after the public was afforded appropriate notice. It is undisputed that the plaintiffs appeared at that hearing and presented their opposition to the plan. Moreover, there is sufficient undisputed evidence that the plan was adopted by the City Council upon a determination that it would serve the best interest of the City of Denver. *See*, Colo.Rev. Stat. § 31–25–107.

The Urban Renewal Law does not require the "usual procedure" outlined by the plaintiffs. In other words, the fact that the defendant BCED may have been identified as the "first choice" developer of the Centerstone Project before the financing method was selected, and before the blight study was conducted, does not violate any statutory provision with respect to implementation of an urban renewal plan under Colorado law.

In his order denying the motions to dismiss, Judge Kane stated that the *Parker* and *Noerr–Pennington* doctrines would not immunize the defendants from acts of bribery or engaging in an illegal conspiracy. *Oberndorf, supra*, 653 F.Supp. at 313 (Order on Motion for Reconsideration). However, the plaintiffs after substantial discovery, have not submitted any evidence indicating that any "deal" was made, bribe taken, or other illegal act committed between the Municipal defendants and the defendant BCED with respect to the adoption or implementation of the urban renewal plan. *See, e.g., Westborough Mall, Inc. v. City of Cape Giradeau, Mo.*, 693 F.2d 733, 743 (8th Cir.1982).

In *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the United States Supreme Court established a two part test for evaluating the propriety of summary judgment in antitrust conspiracy cases. This standard was recently applied in *Gibson v. Greater Park City Co.*, 818 F.2d 722 (10th Cir.1987), a case involving attempts to develop a condominium and retail shopping area at a ski resort in Park City, Utah. The district court, by granting summary judgment, had dismissed the appellants' conspiracy claims based on alleged violations of the federal antitrust and civil rights laws. The Tenth Circuit Court of Appeals stated that the appropriate standard set forth in *Matsushita* required an examination of the following two factors:

"(1) [whether] the plaintiff's evidence of conspiracy [is] ambiguous, i.e., is it as consistent with the defendants' permissible independent interests as with an illegal conspiracy; and, if so, (2) [whether] there is any evidence that tends to exclude the possibility that the defendants were pursuing these independent interests." *Id.* at 724.

In *Gibson*, the appellants attributed a conspiratorial motive to several actions taken by the appellees. In its review, the Tenth Circuit initially examined the various inferences that could be drawn from the appellees' conduct. The Court of Appeals determined that the evidence was "ambiguous," and thus satisfied the first factor of the *Matsushita* test. However, since the appellees' evidence successfully established legitimate business reasons for the conduct, and the appellants' evidence did not sufficiently exclude the possibility that the alleged conspirators acted independently, the district court's decision was affirmed.

I find and conclude that the Municipal defendants' actions, in adopting the urban renewal plan at issue, complied with the requirements of Colorado's Urban Renewal Law. The cited actions by the Municipal defendants, and the defendant BCED, are immune from liability since those actions were taken pursuant to a clearly articulated and affirmatively expressed state pol-

icy as embodied in the Urban Renewal Law. *City of Lafayette v. Louisiana Power and Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978). Moreover, a violation of the law, if any, does not defeat state action immunity with respect to the antitrust and conspiracy claims asserted here. *Boone, supra,* 841 F.2d at 891–92.

■ I further conclude that the evidence of conspiracy produced by the plaintiffs does not reach the threshold level required and that the undisputed evidence indicates that the defendants' actions were consistent with their permissible independent interests in pursuing the Centerstone Project as an effort to revitalize the downtown Denver economy. Defendants respective motions for summary judgment directed against the plaintiffs' antitrust claims are granted.

### B. *Civil Rights Claims.*

Defendants argue that they are entitled to summary judgment on the civil rights claims because the plaintiffs have not been deprived of any constitutional rights. They argue that: (1) the mere threat of condemnation is not a taking, and (2) a legitimate public purpose underlies the urban renewal plan adopted by the City.

■ The adoption of an urban renewal plan is a legislative act that must be upheld if it is rationally related to a public purpose. *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954). Even the presence of a conspiracy will not defeat the validity of an urban renewal plan unless the plaintiffs can show that, because of the conspiracy, no conceivable public purpose in fact exists for the urban renewal legislation. To establish an unconstitutional "taking," the plaintiffs must show that no public purpose exists for the proposed urban renewal project. *Boone v. Redevelopment Agency of San Jose,* 841 F.2d 886 (9th Cir.1988); *Rosenthal & Rosenthal Inc. v. New York State Urban Dev. Corp.,* 771 F.2d 44 (2d Cir.1985), *cert. denied,* 475 U.S. 1018, 106 S.Ct. 1204, 89 L.Ed.2d 317 (1986); *Scott v. Sioux City, Iowa,* 736 F.2d 1207 (8th Cir.1984), *cert. denied,* 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985).

In evaluating whether legislative power is being exercised for a public purpose, the court exercises an extremely narrow authority. "It is not for the court to oversee the choice of the boundary line nor to sit in review on the size of a particular project area." *Berman, supra,* 348 U.S. at 35–36, 75 S.Ct. at 104.

In *Upah, supra,* 640 F.Supp. 1071 Judge Kane considered the claims of a landowner who alleged that the condemnation of his property pursuant to an urban renewal plan violated his constitutional rights. He rejected the landowner's claims, stating, in pertinent part:

"Property, ..., is not absolute. Condemnation for urban renewal purposes is a constitutional limitation on the exercise of property rights. Given its statutory authority, the Thornton Development Authority may engage in activity which results in advantage to one entrepreneur and disadvantage to another so long as a statutorily recognized public purpose is the stated basis for the action. In this case such public purposes as increasing revenues, sales, commerce and employment cannot be gainsaid. The wisdom of decisions made in effectuating such purposes is not a matter given to the courts in our system to consider." *Id.* at 1081.

■ Colorado has recognized that the acquisition of property for the planned elimination of urban blight constitutes a public purpose. *Rabinoff v. District Court,* 145 Colo. 225, 234, 360 P.2d 114, 119 (1961). Moreover, urban renewal is a legitimate public purpose, notwithstanding private ownership of the property involved. *Tracy,* 635 P.2d at 910. With respect to these actions, the property's diminution in value does not constitute a taking. *Scott, supra.* There is no constitutional right to gain the maximum profit from the use of property. *Nopro Co. v. Town of Cherry Hills Village,* 180 Colo. 217, 504 P.2d 344 (1972).

■ I have already determined that the Municipal defendants' actions in enacting the urban renewal plan were taken pursuant to a clearly articulated and affirmative-

ly expressed state policy as embodied in Colorado's Urban Renewal Law. I further conclude that the economic revitalization of the downtown Denver area constitutes a legitimate public purpose underlying the urban renewal project. No unconstitutional "taking" of the plaintiffs' property has occurred.

Plaintiffs were afforded due process at every step of the procedure since public hearings were held, notice was afforded, and the plaintiffs participated in those hearings. Plaintiffs have no equal protection claim because the City Ordinance makes no distinction based on any suspect classification nor does it interfere with any fundamental rights.

Whether the defendants' actions complied exactly with every detailed provision of the Urban Renewal Law in this instance is not properly before me in the context of the federal claims asserted. That issue is appropriate for the state court to decide and appears to be before that tribunal as alleged in the plaintiffs' pending state lawsuits. For purposes of this lawsuit, however, a violation of state law, if any, does not necessarily constitute a violation of the plaintiffs' civil rights. *Snowden v. Hughes*, 321 U.S. 1, 11, 64 S.Ct. 397, 402, 88 L.Ed. 497 (1944); *Rosenthal & Rosenthal, Inc. v. New York State Urban Dev. Corp.*, 605 F.Supp. 612, 618 (S.D.N.Y.), *aff'd*, 771 F.2d 44 (2d Cir.1985), *cert. denied*, 475 U.S. 1018, 106 S.Ct. 1204, 89 L.Ed.2d 317 (1986).

The evidence before me does not support either the plaintiffs' claim for a violation of civil rights or their claim of a conspiracy. Defendants' motions for summary judgment as to these claims are granted.

Accordingly, it is ORDERED that the defendants' motions for summary judgment are granted. Plaintiffs' complaint and action are dismissed with prejudice. Each party shall bear his or its own costs.